UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SONY COMPUTER ENTERTAINMENT AMERICA, INC., <br><br> Plaintiff, <br><br> v. <br><br> STEVEN FILIPIAK, ET AL., <br><br> Defendants. | No. C-04-2318 JCS <br><br> **FINDINGS OF FACT AND CONCLUSIONS OF LAW** <br><br> **ORDER DENYING DEFENDANT'S MOTIONS TO DISMISS [Docket Nos. 62, 69] AND REQUEST FOR JUDICIAL NOTICE [Docket No. 75]** |

On November 10, 2005, the Court conducted a nonjury trial in the above matter and a hearing on Defendant's Motions to Dismiss and Request for Judicial Notice. Pursuant to Federal Rule of Civil Procedure 52(a), the Court hereby makes the following Findings of Fact and Conclusions of Law. The Court DENIES the Motions to Dismiss and Request for Judicial Notice.

## I.   FINDINGS OF FACT

### A.   Introduction

1.   Plaintiff Sony Computers Entertainment America, Inc. ("SCEA"), sued Steven Filipiak on June 14, 2004, seeking injunctive relief and damages for alleged copyright infringement under the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. §§ 1201 *et seq.*, contributory infringement under the Copyright Act, 17 U.S.C. §§ 101 *et seq.*, and unfair competition in violation of state law. Complaint at 1, ¶ 1. SCEA alleged that Filipiak operated an on-line retail store that sold devices used to modify PlayStation and PlayStation 2 video game consoles so as to circumvent copyright protection mechanisms that prevent copied games from being played on them. *Id.* at 2, ¶ 9.

2. Filipiak stipulated to liability under the DMCA and a permanent injunction was entered against him. *See* Declaration of Angus M. MacDonald in Support of Opening Memorandum of Plaintiff Sony Computer Entertainment America Inc. for the Trial on the Papers ("MacDonald Decl."), Ex. 30 (Stipulated Permanent Injunction, filed July 1, 2004 (hereinafter, "the Consent Judgment")). The remaining issue to be resolved is the amount of damages. Filipiak, however, has filed two documents the Court construes as Motions to Dismiss. In these two documents, Filipiak does not challenge the evidence put forth by SCEA in it Opening Memorandum in support of its damage calculation. Instead, he asks the Court to dismiss the action in its entirety for various reasons. Filipiak subsequently filed a Request for Judicial Notice asking that the Court take judicial notice of various documents related to a separate patent infringement action in which SCEA is a defendant ("the Separate Action") and that the November 10, 2005 bench trial on the papers be delayed pending the determination of an appeal in the Separate Action. The Court denied the request to delay the trial in an Order filed October 28, 2005. The Court's ruling on the Motions to Dismiss and Request for Judicial Notice (to the extent that request was not fully resolved in the October 28, 2005 Order) follow its Findings of Fact and Conclusions of Law regarding damages.

**B. Background**

3. In 2002, Filipiak began selling modification chips ("mod chips") for the Sony PlayStation 2 console. MacDonald Decl., Ex. 3 (Filipiak Depo.) at 47. "Mod chips are computer chips that circumvent the technological copyright protection measures in PlayStation consoles and allow users to play unauthorized and illegal copies of PlayStation video games. A counterfeit, unlicensed 'burnt' game disc will not play in an unmodified PlayStation console[], but if a mod chip is installed in a PlayStation console, the counterfeit, unlicensed 'burnt' game disc will play." *Id*., Ex. 30 (Consent Judgment), ¶7. Installation of mod chips generally requires opening up the console, soldering the chip into it, and attaching a number of wires. *Id*., Ex. 3 (Filipiak Depo.) at 38.

4. Customers purchase mod chips in order to play copied games on their PlayStation consoles. *Id*., Ex. 4 (Declaration of Chau Ngo) at ¶ 4.

5. In the fall of 2002, Filipiak quit his day job and opened an on-line store called the-console-corner.com, devoted entirely to selling video game accessories and mod chips. *Id*., Ex. 3 (Filipiak Depo.) at 46- 47.

2

6.      Toward the end of 2003, Filipiak opened a second web site called system-modz.com that sold the same products as were sold on the-console-corner.com.  *Id*. at 99-100.

7.      Starting in June 2004, Filipiak began selling "HDLoader."[1]  "HDLoader is software stored on a disc, which permits a user to make an unauthorized copy of PlayStation video games onto a separate hard drive connected to PlayStation consoles.  By enabling users to copy and then play unlawful copies of PlayStation video games from their hard drives, the HDL loader disc and/or software circumvents the technological copyright protection measures in PlayStation consoles."  *Id*., Ex. 30 (Consent Judgment), ¶ 6.

8.      The Court finds that Filipiak knew at the time he was selling them that the sale of mod chips and HDLoader was illegal under the DMCA.  The evidence shows that Filipiak experienced difficulties with suppliers who were either shut down or who temporarily stopped supplying these devices to him and that he knew these shut-downs and stoppages were caused by legal problems experienced by these suppliers because their circumvention devices were alleged or found to violate the DMCA.  *See id*., Ex. 3 (Filipiak Depo.) at 49-50 (testifying that his first supplier of mod chips, Lik-Sang, was shut down temporarily and then stopped supplying mod chips altogether after Sony, Nintendo and Microsoft successfully sued company for selling mod chips); *id* at 164 (conceding that by selling HDLoader Filipiak was breaking the law); *id*. at 55 (testifying that another supplier, 321 Studios, was shut down under the DMCA as a result of selling circumvention devices and that when this happened, Filipiak began lobbying public officials to change the law).  Filipiak also knew that the sale of mod chips violated the "acceptable use" policies of both EBay (where Filipiak first sold products on the Internet) and PayPal (Filipiak's first online payment processor).  *Id*. at 85-86.  Filipiak testified that although he began selling other products on eBay in 2001, he never sold mod chips on eBay because he knew that their sale violated eBay's acceptable use policy.  *Id*. at 241-242.  Paypal ultimately terminated Filipiak as a customer for violation of its mod chip provisions.  *Id*. at 88-89.

**C.     The June 11, 2004 Cease and Desist Letter and the Subsequent Stipulated Judgments**

---

[1] Plaintiff's Exhibit 1 reflects that the first orders for HDLoader are dated June 1, 2004.

3

9. On June 11, 2004, SCEA's counsel sent a cease-and-desist letter to the attorney of record for the-console-corner.com demanding that Filipiak, the-console-corner.com and System Modz LLC stipulate to an injunction prohibiting the marketing, sale and distribution of mod chips and HDLoader. *See id.*, Ex. 8 (June 11, 2004 Cease and Desist Letter). Filipiak reviewed the letter and signed it on Saturday June, 12, 2004. *Id.*, Ex. 9 (June 12 Agreement). In a letter sent to SCEA with the executed agreement, Filipiak's counsel, John Prusak, represented that Filipiak did not have any HDLoader sotftware in his possession at that time and that when Filipiak received a shipment of HDLoader he was expecting to receive later in the month, he would turn the software over to SCEA. *Id.*, Ex. 9.

10. After Filipiak signed the June 12 Agreement, he removed the devices from his website[2] but continued to sell them. In particular, Filipiak admitted in his deposition that four days after signing the agreement, the expected shipment of HDLoader devices arrived and he shipped 108 of them to customers who had already placed their orders. *Id.*, Ex. 3 at 157. In addition, he made 47 new sales of modchips and HDLoader combined in the three days after he signed the agreement. *Id.*, Ex. 7 (summary of devices sold between June 12, 2004 and June 14, 2004).[3] E-mail correspondence with customers and potential customers shows that Filipiak continued to conduct business as usual as to these products. *See id.*, Exs. 10-18. In response to an inquiry from one customer about the disappearance from the website of HDLoader, Filipiak responded, "I hear bad things are coming from SONY & hide it from the public." *Id.*, Ex. 16 (June 15, 2004 e-mail). Based on this evidence, the Court finds that Filipiak, at the time he signed the June 12, 2004 agreement, did not intend to abide by it and wilfully violated the agreement after he signed it.

---

[2] This process was not immediate but required additional correspondence from SCEA's counsel regarding specific products that were not initially removed. *See id.*, Ex. 19 (June 16, 2004 letter from Angus MacDonald to John M. Prusak).

[3] There is a discrepancy between the chart heading of Exhibit 7, which says it lists sales for June 11, 2004, through June 14, 2004, and the supporting declaration of MacDonald, ¶ 7, which says the figures cover June 12, 2004, through June 14, 2004. At the bench trial, counsel for Plaintiff stipulated that the heading is incorrect and that the correct dates are those stated by MacDonald in his declaration.

4

11. On June 16, 2004, Filipiak signed a stipulated consent judgment.[4] *Id*., Ex. 20 (stipulated consent judgment). In it, he stipulated that he had marketed and sold mod chips and HDLoader software in violation of the DMCA. *Id*., ¶ 5. Under the terms of the injunction, Filipiak was prohibited from marketing or selling mod chips or HDLoader software. *Id*. at 3, ¶ 1. Filipiak also agreed to pay $50,000.00 in damages, while SCEA agreed not to execute that judgment so long as Filipiak complied with the terms of the injunction. *Id*. at 4. On the same day he signed the stipulated consent judgment, Filipiak responded to at least two customer inquiries about HDLoader by providing the link to the page on the-console-corner.com where the device could be found. *Id*., Exs. 21, 22. He told these customers that HDLoader had been removed from the web site because he was "hiding" it and was no longer selling it "publicly." *Id*. He continued to offer to sell mod chips and HDLoader, instructing his "trusted" customers to e-mail him directly to purchase the devices. *Id.*, Exs. 23, 24, 32.

12. On June 22, 2004, SCEA's counsel discovered that Filipiak was continuing to ship HDLoader software to his customers. *Id*., ¶ 8. SCEA's counsel called Filipiak to inform him that SCEA was withdrawing its consent from the stipulated consent judgment because of Filipiak's violations. *Id*., ¶ 9. Filipiak did not dispute that he had continued to ship the HDLoader devices and responded by saying "Yeah, I shouldn't have done that." *Id*. The parties thereafter executed a new consent judgment, containing the same representations as before, signed by Filipiak on June 28, 2004. *Id*., Ex. 30 ("the Consent Judgment"). Under the Consent Judgment, judgment was entered against Filipiak in an amount to be determined based on further discovery. *Id*. at 7. The parties also agreed to conditions for conducting discovery. *Id*. at 4-6. One of these was a provision prohibiting Filipiak from destroying or deleting any documents or computer files reflecting sales of HDLoader software or mod chips. *Id*. at 4. The Consent Judgment also required that Filipiak turn over to SCEA all documents, including electronic files, reflecting his sales of HDLoader and mod chips. *Id*. at 5. The Court entered the Consent Judgment on July 1, 2004. *Id*.

---

[4] The stipulated consent judgment was filed with the Court on June 17, 2004, but was not entered as an Order of Judgment of the Court because, as discussed below, the stipulated consent judgment was replaced by a new agreement.

5

### D. Violation of Non-Destruction Order

13. On July 19, 2004, Filipiak delivered to SCEA's counsel a hard drive that he said he used in his business. *Id*., ¶ 40. The hard drive contained e-mail correspondence for a four-month period in 2004, a few documents pre-dated 2004 and a sampling of invoices and other standard business documents. *Id*., ¶ 41. A computer forensics expert, however, determined that thousands of files had been deleted from the hard drive within the three-day period prior to production of the hard drive. Declaration of Bradford Rothschild in Support of Opening Memorandum of Plaintiff Sony Computer Entertainment America Inc. for the Trial on the Papers Regarding Damages ("Rothschild Decl."). Among these files were numerous documents whose titles indicate they related to sales figures, for example, a document entitled "System-Modz Sales Records 1-23-03 to date." *See* MacDonald Decl., Ex. 31. Based on this evidence, the Court finds that Filipiak intentionally and in bad faith violated the terms of the Consent Judgment as well as his discovery obligations under Rule 26 of the Federal Rules of Civil Procedure.

### E. The Number of Circumvention Devices Sold

14. Filipiak did not provide a calculation of the total number of devices he sold in response to SCEA's interrogatories. *Id*., Ex. 3 at 227. Instead, he provided incomplete reports of sales from three on-line payment processing vendors that he used between 2002 and 2004: 1) PayPal for intermittent periods between 2002 and the end of 2004; 2) PaySystems from January through November 2003; and 3) Payfuse for the first six months of 2004. *Id*. at 264-266, 87-88.

15. Based on these documents, as well as Filipiak's own testimony, the Court finds that Filipiak sold at least 7,039 circumvention devices between 2002 and June 12, 2004, and an additional 155 devices between June 12, 2004, and June 14, 2004. This finding is calculated based on estimates of sales as to each of the three payment process vendors, as set forth below.

16. First, Filipiak produced evidence that his total receipts through PayPal were $879,124.64. *Id*., Ex. 34 (PayPal Record of Receipts). Filipiak testified that 18% of his business consisted of mod chip sales for PlayStation consoles. *Id*., Ex. 3 at 131. This yields PayPal receipts for mod chips in the amount of approximately $158,000.00. Dividing this amount by an average selling price of approximately $31.00 per mod chip, *see* MacDonald Decl., ¶ 45 (explaining basis for calculation of average price), gives rise to an estimate of 5,096 mod chips sold through PayPal.

6

17. Second, as to his PaySystems transactions during the first eleven months of 2003, a summary report provided by Filipiak shows that he sold 1,145 mod chips, that is, around 100 a month. *Id*., Ex. 5.

18. Third, as to his Payfuse sales of circumvention devices, Filipiak produced records only for the period June 1, 2004, through June 14, 2004, showing that he sold 380 circumvention devices (237 mod chips and 157 HDLoaders). *Id*., Ex. 6 and ¶ 15. However, Filipiak also testified that he experienced a 10% increase in sales of mod chips in the early months of 2004 as compared to 2003. Using this figure, it can be estimated that in the first five months of 2004, Filipiak sold a minimum of 573 circumvention devices.[5] These two figures give rise to total Payfuse sales of 953 devices. Of these sales, 155 of were made between June 12 and June 14, 2004. *See id*., Ex. 7.

19. Combining the above numbers, the Court finds that a minimum of 7,039 circumvention devices were sold by Filipiak before June 12, 2004 – that is, 1145 through PaySystems, 5,096 through PayPal and 798 through Payfuse – and 155 circumvention devices were sold by Filipiak *after* June 12, 2004.

## II. CONCLUSIONS OF LAW

### A. The Amount of Statutory Damages

20. The DMCA makes it illegal to "manufacture, import, offer to the public, provide, or otherwise traffic in any technology, product, service, device, component, or part thereof, that . . . is primarily designed or produced for the purpose of circumventing a technological measure that effectively controls access to a work protected" by copyright. 17 U.S.C. § 1201(a)(2). Filipiak has stipulated to liability under this provision and on that basis the Court concludes that Filipiak has violated the DMCA.

21. Under the DMCA, a plaintiff may elect to recover statutory damages in an action to enforce § 1201. 17 U.S.C. § 1203(c)(3). In particular, the DMCA provides for an award of statutory damages as follows:

---

[5] This figure is derived as follows: First, to calculate the rate of sales for the first five months of 2004, add to 1145 (the total devices sold on PaySystems for the first 11 months of 2003) an additional 114.5 (the 10% increase) and divide by 11 (the number of months). This gives rise to a calculation of 114.5 per month in sales. This figure is then multiplied by 5 (the months of 2004 for which Plaintiff has not provided sales figures), which gives rise to total sales of 572.5. The Court then rounds this number up to 573.

7

> At any time before final judgment is entered, a complaining party may elect to recover an award of statutory damages for each violation of section 1201 in the sum of not less than $200 or more than $2,500 per act of circumvention, device, product, component, offer, or performance of service, as the court considers just.

17 U.S.C. § 1203(c)(3)(A). Section 1203(c)(5)(A) further provides that the Court may reduce the award of damages "in any case in which the violator sustains the burden of proving, and the court finds, that the violator was not aware and had no reason to believe that its acts constituted a violation."

22. The Court concludes that § 1203(c)(3)(A) authorizes a separate award of statutory damages for each device sold. *See DirecTV, Inc. v. Hendrix*, 2005 WL 757562 (N.D. Cal.) at *5-6 (calculating statutory damages under Federal Communications Act by multiplying the number of illegal theft devices sold by the statutory amount).

23. Because there are no decisions construing what is "just" under § 1203(c)(3)(A), the Court looks to cases that construe a similar provision, 17 U.S.C § 504(c), which also provides for statutory damages "as the court considers just." *See* Howard B. Abrams, 2 The Law of Copyright § 17:62 (West: 2005) ("Although there have been no judicial precedents as yet about the award of statutory damages under the provisions of section 1203, it seems quite reasonable to assume that the precedents concerning statutory damages under section 504(c) of the Copyright Act are highly persuasive if not determinative"). "Factors the Court can consider in determining the amount of a damages award [under § 504(c)] are: the expense saved by the defendant in avoiding a licensing agreement; profits reaped by defendant in connection with the infringement; revenues lost to the plaintiff; and the willfulness of the infringement. . . . The Court can also consider the goal of discouraging wrongful conduct." *Controversy Music v. Shiferaw*, 2003 WL 22048519 at *2 (N.D. Cal.) (citations omitted).

24. "In the copyright infringement context, 'willful' means acting with knowledge that one's conduct constitutes copyright infringement." *Dolman v. Agee*, 157 F.3d 708, 715 (9th Cir. 1998); *see also In re Aimster Copyright Litig.*, 334 F.3d 643 (7th Cir. 2003) ("[w]illful blindness is knowledge, in copyright law (where indeed it may be enough that the defendant should have known of the direct infringement)").

25. SCEA asks the Court to award $800 per circumvention device for the devices estimated to have been sold by Filipiak before June 12, 2004, and $2,500 for the 155 devices sold or shipped after

8

1 June 12, 2004 (the date he executed the original June 12 Agreement).[6] The Court finds that these "per
2 infringement" amounts are just.

3     26.     First, as discussed above, the evidence clearly shows that Filipiak was aware at all times
4 that he was violating the DMCA when he sold mod chips and HDLoader. Therefore, the Court concludes
5 that Filipiak willfully violated the DCMA.

6     27.     Second, although the estimate of devices may not be exact, it is reasonable. Further, any
7 uncertainty as to the exact amount sold is a result of Filipiak's own conduct, including his failure to provide
8 complete responses to SCEA's discovery requests concerning his sales and his intentional deletion of
9 thousands of files from his hard drive, including documents that might have allowed the Court to determine
10 the actual level of his sales. Under such circumstances, it is appropriate that SCEA be awarded significant
11 statutory damages. *See Fitzgerald Publ'g Co. v. Baylor Publ'g Co., Inc.*, 807 F.2d 1110, 1117 (2d
12 Cir. 1986) (noting that in determining the appropriate level of statutory damages under § 504(c) of the
13 copyright act, courts may consider "whether a defendant has cooperated in providing particular records
14 from which to assess the value of the infringing material produced").

15     28.     Third, as to the devices sold after June 12, 2004, the Court concludes that Filipiak was
16 even more culpable than he was with respect to previous sales because, as found above, he signed an
17 agreement with SCEA that he would immediately discontinue selling and distributing circumvention devices
18 without intending to abide by it and proceeded to engage in the exact behavior he had promised SCEA he
19 would not, albeit surreptitiously.

20     29.     Accordingly, the Court finds that SCEA is entitled to statutory damages in the amount of
21 $5,631,200.00 (that is, 7,039 x 800) for the pre-June 12, 2004 sales and $387,500.00 (that is, 155 x
22 2,500) for the sales after June 12, 2004, giving rise to a total of $6,018,700.00 in damages. While this
23 award of damages is substantial, the Court concludes that it is both consistent with Congressional intent and

---

[6] This figure includes the 47 devices that were sold and the 108 HDLoader devices that were shipped in the three days after after Filipiak signed the June 12 Agreement. *See* Paragraph 10, *supra*.

9

1 necessary to discourage wrongful conduct by other potential retailers who might be tempted to engage in
2 what might otherwise appear to be a lucrative business selling illegal contravention devices.[7]

### C. Filipiak's Motions to Dismiss

30. In his First Motion to Dismiss, Filipiak asks the Court to dismiss this action on the basis of alleged litigation misconduct on the part of SCEA. He also asserts the action should be dismissed because he has made unspecified charitable contributions and because he sells many items on his web site that are not illegal. In his Second Motion to Dismiss, Filipiak asserts the action should be dismissed on the basis of a ruling by the trial court in a separate action ("the Separate Action") in which it was held that SCEA's PlayStation and PlayStation 2 infringe patents held by Immersion Corporation. In connection with this Motion, Filipiak also requests that the Court take judicial notice of various newspaper articles and documents in that case. The Court concludes that Filipiak's arguments have no merit.

31. Given that the issue of liability was resolved in the Consent Judgment, the Court construes Filipiak's Motions to Dismiss as requests to vacate the Consent Judgment. Courts may exercise their inherent equitable powers to vacate or modify an interlocutory order where it is in the interest of justice. *A & A Sign Co. v. Maughan*, 419 F.2d 1152, 1155 (9th Cir. 1969). "The major grounds justifying reconsideration of interlocutory orders are an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Reich v. Hall Holding Co., Inc.*, 990 F. Supp. 955, 965 (N.D. Ohio 1998) (citations omitted). The Court finds nothing in Filipiak's Motions that justifies vacating the Consent Judgment.

32. The allegations of misconduct fail both because they are not supported by the evidence and because, even if true, there is no suggestion Filipiak was prejudiced in any way. Filipiak asserts that SCEA committed misconduct when it failed to reimburse him for travel expenses SCEA agreed to pay in connection with a mediation in San Francisco. SCEA, however, has filed a declaration in which SCEA's counsel states he was simply waiting for verification of Filipiak's expenses and that once it was received, a check was issued and sent to Filipiak. *See* Declaration of Angus M. MacDonald in Opposition to

---

[7] Although Plaintiff sought attorneys' fees and costs, as well as prejudgment interest in its trial brief, it stipulated at oral argument that it would waive these requests. Accordingly, the Court does not reach Plaintiff's request for attorneys' fees and costs and prejudgment interest, which are denied without prejudice to Plaintiff's right to request these items in the future should the Court's damage award be reversed on appeal.

1  Defendant Steven L. Filipiak's July 14, 2005 Motion to Dismiss and his September 12, 2005 Motion to
2  Dismiss and Request for Judicial Notice ("MacDonald Opposition Decl."), ¶ 6. Filipiak has presented no
3  evidence to the contrary. Filipiak also points to the fact that SCEA did not send him a copy of his
4  deposition transcript. SCEA, however, correctly notes that it was Filiak's responsibility to request a copy
5  of the transcript from the court reporter. Nonetheless, SCEA sent Filipiak a copy of the transcript free of
6  charge. *Id*., ¶ 11. Therefore, the Court rejects Filipiak's assertion that SCEA's misconduct requires that
7  the Consent Judgment be vacated.

8      33.    Filipiak's reliance on developments in the Separate Action involving alleged patent
9  infringement by SCEA also is misplaced. The fact that components of PlayStation and PlayStation 2 may
10 infringe patents owned by a third party has no bearing on the issues raised in this action. For the same
11 reason, the Court declines to take judicial notice of the documents relating to that action filed by Filipiak.

## III.  CONCLUSION

For the forgoing reasons, the Court finds in favor of Plaintiff and against Defendant and awards damages in the amount of $6,018,700.00.

IT IS SO ORDERED.

Date: December 27, 2005

JOSEPH C. SPERO
United States Magistrate Judge